FILED

JUN 01 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. **1 :26 CR 0 0 2 6 3** |
| | ) | Title 18, United States Code, |
| TRAVIUS HOLLOWAY, | ) | Sections 1343 and 2 |
| | ) | |
| Defendant. | ) | **JUDGE POLSTER** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Defendant and Relevant Entities

1.      Defendant TRAVIUS HOLLOWAY resided in Richmond Heights, Ohio, in the Northern District of Ohio, Eastern Division.

2.      Bank 1 was a federally insured financial institution headquartered in North Carolina.  Bank 1 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio.  Bank 1's servers were located in Texas and California.

3.      Bank 2 was a federally insured financial institution headquartered in Minnesota. Bank 2 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio.  Bank 2's servers were located in Minnesota and Kansas.

4.      Bank 3 was a federally insured financial institution headquartered in Birmingham, Alabama.  Bank 3's server was located in Alabama.

## Unemployment Insurance Background

5. The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system. The UI system provided temporary financial assistance to eligible lawful workers who were unemployed through no fault of their own. The purpose of the UI system was twofold: to lessen the effects of unemployment through direct cash payments to laid-off workers; and to ensure that life necessities were met weekly while the worker sought employment.

6. State unemployment systems and benefits were joint federal and state enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in the state. SWAs administered UI programs in accordance with federal laws and regulations. Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits were paid. Generally, UI weekly benefit amounts were based on a percentage of a lawful worker's earnings over a base period. When state unemployment benefits were exhausted, the U.S. Department of Labor ("DOL") could supplement them with federal funds.

7. Because of the COVID-19 pandemic, legislation expanded the SWAs' ability to provide UI benefits. On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law. The CARES Act expanded SWAs' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided for new programs, including Pandemic Unemployment Assistance ("PUA") and other programs ("Pandemic UI").

8. The California SWA was the Employment Development Department ("EDD"). The California SWA used Bank 1 to administer Pandemic UI benefits. If the California SWA

2

approved the claimant's application, Bank 1 mailed a debit card to the claimant which was subsequently loaded with benefits on the claimant's card at certain intervals. The claimant could change the mailing address with Bank 1 after the claim was approved. Bank 1 servers are located in Texas and California. Pandemic UI applications to the California SWA were routed through servers located in California.

9.      The Ohio SWA was the Office of Unemployment Insurance Operations, which was part of the Ohio Department of Job and Family Services ("ODJFS"). The Ohio SWA used Bank 2 to administer Pandemic UI benefits. If the Ohio SWA approved the claimant's application, Bank 2 mailed a debit card to the claimant which was subsequently loaded with benefits on the claimant's card at certain intervals. The Ohio SWA also allowed a claimant to receive UI benefits through direct deposit into a bank account of the claimant's designation. Pandemic UI applications to the Ohio SWA were routed through servers located in Virginia.

10.      The Alabama SWA was the Alabama Department of Workforce ("ADW"). The ADW used Bank 3 to administer Pandemic UI benefits. The ADW allowed claimants to receive UI benefits through direct deposit into a bank account of the claimant's designation, the payments which were sent via ACH deposit from Bank 3. The ADW's servers for PUA were located in Alabama.

11.      When applying for Pandemic UI, claimants answered various questions to establish their eligibility, including whether they had performed work in the state in which they were claiming Pandemic UI benefits. Claimants were required to provide personal identifying information, which included their name, mailing address, gender, email, phone number, social security number, and date of birth. Moreover, claimants had to identify a qualifying

3

occupational status and COVID-19-related reason for being unemployed.  Claimants could also submit several documents as evidence of their income.

## Paycheck Protection Program Background

12.     The Paycheck Protection Program ("PPP") was a COVID-19 pandemic relief program administered by the U.S. Small Business Administration ("SBA") that provided forgivable loans to small businesses for job retention and certain other expenses.  The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic.  PPP loans were fully guaranteed by the SBA.

13.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, and was required to provide, among other things, its average monthly payroll expenses and number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

14.     Sole proprietorship applicants (including a self-employed individual, also known as a "Schedule C business") could use the proprietorship's annual gross revenue as the "payroll" figure and were not required to provide documentation in the same manner as other applicants.

4

Some versions of the application form specifically directed applicants to enter the gross revenue from a particular federal income tax form.

15. PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located outside the State of Ohio, in Virginia or Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

16. Lender 1 was a third-party participating lender in the PPP. Lender 1 received PPP loan applications through Processor 1, which received applications through its website and transmitted applications to Lender 1 and other participating PPP lenders. PPP loan applications to Lender 1 through Processor 1 were transmitted across state lines because Processor 1's servers were in Oregon, while Lender 1's servers were located in Ohio.

## COUNT 1
### (Wire Fraud, 18 U.S.C. §§ 1343 and 2)

The United States Attorney charges:

17. The factual allegations contained in paragraphs 1 through 16 of this Information are re-alleged and incorporated as though fully set forth herein.

### The Scheme to Defraud

18. From in or around May 2020 through in or around June 2022, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant TRAVIUS HOLLOWAY, and others known and unknown to the United States Attorney, knowingly devised, and intended to devise, a scheme and artifice to obtain government-funded Pandemic stimulus funds by fraud, defrauding, and obtaining money and property to which Defendant was not entitled from, (1) the United States Department of Labor, EDD, ODJFS and other state SWAs, and (2) the U.S. SBA

5

and Lender 1, all by means of false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

Manner and Means of the Scheme

19.     It was part of the scheme that:

a.      Defendant and others knowingly made and caused to be made materially false statements and omissions on Pandemic UI applications to EDD, ODJFS, ADW, and other state SWAs to appear to be eligible to receive Pandemic UI benefits, including false statements regarding employment history, residency, and other information, and misrepresentations about who was receiving the benefits sought.

b.      These materially false statements and omissions on the Pandemic UI benefits applications induced DOL, EDD, ODJFS, ADW, and other SWAs to issue Pandemic UI benefits to which Defendant and others were not entitled, totaling $370,982 in Pandemic UI funds, including in the form of debit cards from Bank 1 for benefits from EDD, and a direct deposits by Bank 2 and Bank 3 into accounts controlled by Defendant, for benefits from ODJFS and ADW.

c.      Defendant received the fraudulently obtained Bank 1-issued debit cards and used them to make cash withdrawals at bank ATMs and other locations in the Northern District of Ohio, thereby obtaining Pandemic UI benefits he was not qualified or authorized to receive.

d.      Defendant, through interstate wire communications, submitted and caused to be submitted, a PPP loan application to Lender 1 in Defendant's name, which contained materially false statements and omissions regarding Defendant's business.

6

e. As a result of the fraudulent PPP loan application, Defendant caused Lender 1 issue to an account controlled by Defendant PPP loan funds, thereby obtaining PPP loan proceeds he was not qualified or authorized to receive.

Acts in Furtherance of the Scheme

20. In furtherance of the scheme, and to accomplish its purposes and conceal the existence thereof, Defendant committed and caused to be committed, in the Northern District of Ohio, and elsewhere, the following acts, among others:

*Victim 1 California PUA Application*

21. On or about August 24, 2020, Defendant caused to be submitted to EDD an electronic application for Pandemic UI benefits in the name of Victim 1. The information on the application concerning Victim 1's residence, employment, and income was false, along with misrepresentations about who was receiving the benefits sought. Victim 1 never gave anyone permission to apply for Pandemic UI benefits on their behalf and did not reside at the residence listed on the application.

22. On or about August 26, 2020, Defendant caused Bank 1 to send, via regular U.S. mail, to an address in California, a Bank 1-issued debit card in the name of Victim 1, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $22,800.

23. On or about September 14, 2020, Defendant withdrew $1,000 from a Bank 1 ATM located in Atlanta, Georgia, using the Bank 1-issued debit card in the name of Victim 1, thereby obtaining California Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

7

*Victim 2 California PUA Application*

24.     On or about August 28, 2020, Defendant caused to be submitted to EDD an electronic application for Pandemic UI benefits in the name of Victim 2.  The information on the application concerning Victim 2's residence, employment, and income was false, along with misrepresentations about who was receiving the benefits sought.  Victim 2 never gave anyone permission to apply for Pandemic UI benefits on their behalf and did not reside at the residence listed on the application.

25.     On or about August 30, 2020, Defendant caused Bank 1 to send, via regular U.S. mail, to an address located in California, a Bank 1-issued debit card in the name of Victim 2, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $23,700.

26.     From on or about September 11, 2020, to on or about September 21, 2020, Defendant withdrew at least $4,000 in PUA funds from Bank 1 ATMs located in Mayfield Heights, Ohio and Atlanta, Georgia, using the Bank 1-issued debit card in the name of Victim 2, thereby obtaining California Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's Ohio PUA Application*

27.     On or about May 30, 2020, Defendant caused to be submitted to ODJFS an electronic application for Pandemic UI benefits his name.  The information on the application concerning Defendant's employment was false.

28.     Between on or about June 1, 2020, through on or about July 13, 2020, Defendant caused ODJFS to send approximately $12,213 in Ohio PUA benefits to an account controlled by

8

Defendant, thereby obtaining Ohio Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's California PUA Application*

29.     On or about July 7, 2020, Defendant caused to be submitted to EDD an electronic application for Pandemic UI benefits.  The information on the application concerning Defendant's residence employment was false.

30.     On or about July 8, 2020, Defendant caused Bank 1 to send, via regular U.S. mail, to Defendant's address located in Richmond Heights, Ohio, a Bank 1-issued debit card in the name of Defendant, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $17,493.

31.     On or about July 14, 2020, the Bank 1-issued debit card in Defendant's name was linked to a Cash App account in Defendant's name.

32.     Between on or about July 14, 2020, and on or about July 19, 2020, approximately $12,716 was sent from Defendant's Cash App account to multiple individuals, including to a co-conspirator.  The source of the funds was the Bank 1-issued debit card in Defendant's name. Thus, Defendant obtained California Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's Alabama Application*

33.     On or about March 3, 2021, Defendant caused to be submitted to ADW an electronic application for Pandemic UI benefits in Defendant's name.  The information on the application concerning Defendant's residence and employment was false, along with misrepresentations about Defendant not filing or receiving unemployment benefits from another state within the last 12 months.

9

34. Between on or about March 18, 2021, through on or about April 7, 2021, Defendant caused Bank 3 to deposit Alabama PUA benefits into a bank account in Defendant's name in the approximate amount of $4,734.

*Defendant's PPP Application*

35. On or about May 12, 2021, Defendant caused to be submitted an electronic application to the SBA for a PPP loan in the name of Defendant, doing business as "Trav McFilms." The PPP application requested a loan amount of $121,865, and stated that the borrower was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contractors.

36. The information on the application concerning the date Trav McFilms was established was false. In addition, the information concerning the number of employees, the amount of state unemployment tax paid to the state of Ohio, as well as the 2019 gross income of Trav McFilms was false. Moreover, the PPP application included a State of Ohio Articles of Organization document for Tra-V MCFILMS LLC. This document was fraudulent and listed the incorrect effective date of the organization.

37. On or about May 25, 2021, Defendant caused Lender 1 to issue a PPP loan in the amount of $121,865 to Defendant's bank account.

38. On or about June 1, 2022, Defendant caused to be submitted a PPP Loan Forgiveness Application that requested loan forgiveness amount of $121,865 and stated $73,119 was spent on payroll costs. The statement regarding payroll costs was false.

39.     On or about June 8, 2022, Defendant's fraudulent Forgiveness Application caused the SBA to remit to Lender 1 the forgiveness amount of $121,865 in principal and $1,268.73 in interest for the PPP loan in Defendant's name. Thus, Defendant obtained a PPP loan for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

Execution of the Scheme

40.     On or about June 1, 2022, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant TRAVIUS HOLLOWAY, for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused to be transmitted the following writings, signs, signals, pictures, and sounds by means of wire communications in interstate commerce, to wit: an electronic application PPP Loan Forgiveness Application, causing an interstate wire communication from the Northern District of Ohio.

All in violation of Title 18, United States Code, Sections 1343 and 2.

DAVID M. TOEPFER
United States Attorney

By: _____

Elliot Morrison
Chief, White Collar Crimes Unit

11